IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**BOUNTY MINERALS, LLC,**

    **Plaintiff,**

**v.**                                            CIVIL ACTION NO. 1:17cv219
                                                c/w 1:17cv220
                                                   (Judge Keeley)

**EQT PRODUCTION COMPANY,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTIONS TO DISMISS [DKT. NO. 25][1]**

During a joint scheduling conference in these consolidated cases on March 12, 2018, the Court **GRANTED in part** and **DENIED in part** the defendant's motions to dismiss. This Memorandum Opinion and Order explains the Court's reasoning in support of that decision.

## I. BACKGROUND

The facts are taken from the amended complaints and, as they must be, are construed in the light most favorable to the plaintiff. See De'Lonta v. Johnson, 708 F.3d 520, 524 (4th Cir. 2013). On November 6, 2017, the plaintiff, Bounty Minerals, LLC ("Bounty"), filed two related cases in the Circuit Court of Monongalia County, West Virginia, against the defendant, EQT Production Company ("EQT") (Dkt. No. 1-3). EQT is the record lessee

---

[1] Unless otherwise noted, citations to docket entries in this Memorandum Opinion and Order refer to the lead case, Civil No. 1:17cv219.

of two tracts in which Bounty owns a mineral interest, but Bounty alleges that the relevant leases have terminated for lack of production. (Dkt. No. 15 at 2-5). The complaints make claims for relief based on the alleged lease terminations, including 1) declaratory judgments that the relevant leases and their amendments have terminated, 2) ejectment, 3) slander of title, 4) breach of the implied covenant of further exploration, and 5) breach of the implied covenant of development.

EQT removed the cases to this Court on December 18, 2017, based on the Court's diversity jurisdiction (Dkt. No. 1). On December 26, 2017, EQT moved to dismiss the complaints (Dkt. No. 5). When Bounty filed amended complaints on January 12, 2018 (Dkt. No. 15), the Court denied EQT's motions to dismiss as moot (Dkt. No. 16). Then, on January 16, 2018, EQT moved to dismiss Bounty's amended complaints (Dkt. No. 17). At a joint scheduling conference on March 12, 2018, the Court consolidated the cases and granted in part and denied in part EQT's motions (Dkt. No. 34).

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) allows a defendant to move for dismissal on the grounds that a complaint does not "state a claim upon which relief can be granted." When reviewing a complaint, the

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTIONS TO DISMISS [DKT. NO. 25]**

Court "must accept as true all of the factual allegations contained in the complaint." Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted).

A court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). "[A] complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" Anderson, 508 F.3d at 188 n.7 (quoting Twombly, 550 U.S. at 547). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

In deciding the motion, the court need not confine its inquiry to the complaint; it may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). The court may also consider documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic." <u>Philips v. Pitt Cty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009).

### III. DISCUSSION

**A.  Termination for Lack of Production**

In Counts One through Three of the amended complaint, Bounty seeks a declaratory judgment that the relevant leases and their amendments have terminated for lack of production and are no longer enforceable, as well as an order ejecting EQT from the tracts at issue. (Dkt. No. 15 at 5-6). In its motion to dismiss, EQT argues that, under West Virginia law, "production is irrelevant when determining whether a lease with a flat-rate provision or a shut-in royalty provision is abandoned or terminated" (Dkt. No. 26 at 5). Given that Bounty has not offered a compelling reason to depart

from existing precedent in West Virginia and the Fourth Circuit, the Court agrees with EQT that Bounty's claims for declaratory relief and ejectment fail as a matter of law.

1.  **Applicable Law**

The controlling West Virginia precedent on this matter is Bruen v. Columbia Gas Transmission Corp., 426 S.E.2d 522 (W. Va. 1992). The habendum clause in that case provided that the lease would be "for the term of ten years (and so long thereafter as oil or gas is produced from the land leased and royalty and rentals paid by lessee therfore)." Id. at 523 (emphasis supplied in original). The lease provided for an enumerated royalty for oil, as well as an "annual rent of $200 for each gas well 'from the time and while the gas is marketed." Id. Critically, the lease also contained the following "flat-rate" provision:

> Lessee agrees to pay Lessor Twelve Hundred Dollars ($1200.00) per year net rental until the royalties and rentals reserved in this lease exceed that amount unless lease be surrendered before said time as above provided.

Id. at 524.

Although the lessee, Columbia Gas, faithfully tendered the $1200 annual "net rental," the lessors alleged that the lease had terminated due to an "alleged failure to produce oil and gas in paying quantities." Id. at 523. The Supreme Court of Appeals

5

rejected the lessors' argument, concluding that the "quantity of production is irrelevant" in the case of a flat-rate lease. Id. at 524-25 (citing Goodwin v. Wright, 255 S.E.2d 924 (W. Va. 1979); Ketchum v. Chartiers Oil Co., 5 S.E.2d 414 (W. Va. 1939); McCutcheon v. Enon Oil & Gas Co., 135 S.E. 238 (W. Va. 1926); Bassell v. West Virginia Central Gas Co., 103 S.E. 116 (W. Va. 1920); McGraw Oil Co. V. Kennedy, 64 S.E. 1027 (W. Va. 1909)). The court further reasoned that the express terms of the lease did not require any particular amount of production, but instead required "'flat' payments of rental in the amount of $1200 per year, regardless of production." Id. at 525 (emphasis in original). The court held unequivocally:

> If an oil and gas lease contains a clause to continue the lease for a term "so long thereafter as oil and gas is produced," but also provides for "flat-rate" rental payments, then quantity of production is not relevant to the expiration of the term of the lease if such "flat-rate" rental payments have been made by the lessee.

Id. at 527.

Subsequent to the decision in Bruen, the Southern District of West Virginia and the Fourth Circuit have interpreted its holding quite broadly. For example, in Wellman v. Bobcat Oil & Gas, Inc., the lease at issue had a primary term of ten years and secondary term for "as long thereafter as oil or gas, or either of them, is

6

produced from said land." No. 3:10-0147, 2011 WL 6415487, at *2 (S.D.W.Va. Dec. 21, 2011). Much like the lease in <u>Bruen</u>, it further provided for a 1/8 royalty on oil and a flat-rate payment of "Seventy Five ($75.00) dollars each three months in advance for gas from each and every gas well drilled on said premises . . . to be paid each three months thereafter while the gas from said well is marketed and produced." <u>Id.</u> Because production from the well was intermittently interrupted, the plaintiffs argued that the secondary term had expired, thereby terminating the lease under the plain language of the habendum clause. The district court was asked to decide "whether, as a matter of law, the secondary term of the . . . lease can be terminated by nonproduction of gas." <u>Id.</u> at *3.

Although their lease included a flat-rate provision, the plaintiffs attempted to distinguish <u>Bruen</u>, arguing that it involved whether there was production in paying quantities, not "whether there was any production." <u>Id.</u> at *4 (emphasis added). The Southern District of West Virginia rejected the plaintiffs' argument:

> <u>Bruen</u> is explicit that "quantity of production is irrelevant." This proposition applies equally to situations where production is zero and where production is "non-paying." Additionally, <u>Bruen</u> ratifies several older cases holding that the lessee of a flat-rate lease simply has no interest in the production of the leased well. . . . The case law is clear: a lessee who makes required payments on a flat-rate mineral lease may avoid this contractual termination clause of the lease

7

agreement even without producing any minerals from the leased mineral estate.

Id.

On appeal, the Fourth Circuit affirmed the district court's application of Bruen. In doing so, it acknowledged that the language of the habendum clause appeared to require production as a condition of extending the secondary term. The court further reasoned, however, that under Bruen, the addition of a flat-rate rental provision modified the application of the habendum clause's otherwise contrary mandate. Wellman v. Bobcat Oil & Gas, Inc., 524 F. App'x 26, 30-31 (4th Cir. 2013) (unpublished decision).

**2. Application**

On its face, this case presents the same circumstances at issue in Wellman. The habendum clauses in the relevant leases include language appearing to limit the secondary term as follows: 1) "as long thereafter as oil or gas, or either of them, is produced"; 2) "as long thereafter as operated by the Lessee in the search for or production of [minerals]" or being used for gas storage. But, the parcels are also subject to the following flat-rate royalty provisions:

> Parcel One: "[P]arty of the second part covenants and agrees . . . to pay one hundred $100.00 Dollars each three months for gas from each and every gas well drilled

on said premises, the product of which is marketed and used off the premises . . . ."

Parcel Two: "[P]arty of the second part covenants and agrees . . . to pay $87.50 Dollars each three months in advance for the gas from each and every gas well drilled on said premises, the product of which is marketed and used off the premises, while the gas from said well is so marketed and used."

Under West Virginia law as interpreted by the Fourth Circuit in <u>Wellman</u>, "[b]ecause the Lease[s] provide[] for the payment of a flat-rate rental to [Bounty], the quantity of production - whether high, low, or zero - is utterly irrelevant for determining whether the secondary term of the Lease[s] expired, again assuming the payments are in fact made." 524 F. App'x at 31 (emphasis in original). Indeed, in both of its amended complaints, Bounty alleges - and thus admits - that EQT has continued to send it purported flat-rate payments.

Bounty nonetheless contends that the cases in suit are distinguishable because they deal with "a well incapable of production," rather than a well that "was either producing or indisputably capable of production but shut-in" (Dkt. No. 31 at 14-16). Ultimately, this is a distinction without a difference, and Bounty's arguments regarding the unfavorable nature of this outcome are not persuasive.

First, Bounty contends that such a holding would ignore the plain language of the leases. More particularly, it argues that language limiting the lessee's vested interest under the habendum clauses would have no meaning if a flat-rate payment could nonetheless continue the lease. See Syl. Pt. 3, Dunbar Fraternal Order of Police, Lodge No. 119 v. City of Dunbar, 624 S.E.2d 586 (W. Va. 2005) ("[S]pecific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract."). Notably, the same secondary-term limitations were present in Bruen and Wellman, but did not affect the courts' decisions. See Bruen, 426 S.E.2d at 523, 527; Wellman, No. 3:10-0147, 2011 WL 6415487, at *5 (recognizing that the result compelled by Bruen appeared inconsistent with the language of the habendum clause); Wellman, F. App'x at 30-31 (reasoning that the provision of a flat-rate payment modified application of the habendum clause).

Second, Bounty contends that, if the lease does not terminate when there is no well capable of production during the secondary term, then 1) EQT can continue the lease as long as it "is willing to make minimal quarterly payments," and 2) "an operator would not even need to drill a well before the end of the primary term to continue the lease" (Dkt. No. 31 at 15-16). The former concern is

eliminated by the implied covenant to develop the leasehold. Under West Virginia law, a lessee simply cannot hold a lease in perpetuity without undertaking reasonable efforts to profit from the land. See St. Luke's United Methodist Church v. CNG Development Co., 663 S.E.2d 639 (W. Va. 2008). The latter concern is refuted by the language of the leases, each of which apply the flat-rate rental only to gas wells that are drilled on the premises. In other words, in order for the lessee to hold a well through payment of a flat-rate rental, there must be an existing well to which the payment applies.

Finally, Bounty contends that applying the holdings of Bruen and Wellman to the facts of this case impermissibly fails to construe the leases "as to promote development and prevent delay and unproductiveness," and that the parties' differing interpretations of the habendum clause render the contract ambiguous (Dkt. No. 31 at 16-17). But West Virginia's edict to "prevent delay and unproductiveness" when interpreting oil and gas leases existed long before Bruen was decided. See Syl. Pt. 3, Parish Fork Oil Co. v. Bridgewater Gas Co., 42 S.E. 655 (W. Va. 1902). Moreover, "[t]he mere fact that the parties do not agree to the construction of a contract does not render it ambiguous." Syl. Pt. 4, Mylan Labs. Inc. v. Am. Motorists Ins. Co., 700 S.E.2d 518

(W. Va. 2010) (citing Syl. Pt. 1, Berkeley Co. Pub. Serv. v. Vitro Corp., 162 S.E.2d 189 (W. Va. 1968)).

B.  **Slander of Title**

In Count Four, Bounty alleges that EQT's conduct constitutes slander of Bounty's mineral title in the land (Dkt. No. 15 at 6-7). EQT argues that Bounty has failed to adequately plead the necessary elements of a claim for slander of title (Dkt. No. 26 at 11).

In West Virginia, the elements of slander of title are (1) publication of (2) a false statement (3) derogatory to plaintiff's title (4) with malice (5) causing special damages (6) as a result of diminished value in the eyes of third parties. Syl. Pt. 3. TXO Production Corp. v. Alliance Resources Corp., 419 S.E.2d 870, 879 (W. Va. 1992). "As a general rule, 'wrongfully recording an unfounded claim to the property of another' satisfies the first three elements and is actionable 'provided that the other elements for slander of title, namely malice and special damages, are present.'" Bissett v. Chesapeake Appalachia, LLC, No. 5:13CV20, 2013 WL 12213901, at *3 (N.D.W.Va. May 2, 2013) (quoting TXO Production, 419 S.E.2d at 880).

Here, Bounty has alleged that, "by continuing to publish and claim an interest under the [leases], which have clearly terminated

as a matter of law," EQT has committed slander of Bounty's mineral title in the land (Dkt. No. 15 at 6). For the reasons discussed above, however, the leases at issue have not been terminated for lack of production. Because the leases have not been terminated, and because EQT holds the rights under those leases, there has been no "publication of a false statement." Because Bounty cannot establish the first two elements, it has failed to state a claim for slander of title.

**C.   Implied Covenant of Further Exploration**

In Count Five, Bounty alleges that, by "failing to explore unconventional formations with reasonable diligence," EQT has breached the implied covenant of further exploration (Dkt. No. 15 at 7). In its motion to dismiss, EQT persuasively argues that West Virginia does not recognize a claim for breach of the implied covenant of further exploration (Dkt. No. 26 at 13-14).

The implied covenant of further exploration requires "a lessee to 'further explore' the leased premises to discover and ultimately produce from unproven or possibly deeper strata. Under the so-called further exploration covenant, a lessee would have an implied duty (absent express language to the contrary) to explore potentially productive but unproven strata on the leased premises."

George A. Bibikos, <u>A Review of the Implied Covenant of Development in the Shale Gas Era</u>, 115 W. Va. L. Rev. 949, 965 (2013) (noting that the implied covenant of further exploration is "not widely recognized as a separate covenant and not adopted in . . . West Virginia").

    Notably, Bounty has failed to identify any case in which a West Virginia court has expressly recognized the implied covenant of further exploration. Instead, it cites <u>St. Luke's United Methodist Church v. CNG Development Co.</u>, to argue that West Virginia recognizes an implied covenant to further explore based on the Supreme Court's passing mention of operators' "obligation to explore, develop, and produce." 663 S.E.2d 639, 646 (W. Va. 2008). As discussed further below, in <u>St. Luke's</u>, the Supreme Court of Appeals affirmed the existence of an implied covenant to develop. <u>See id.</u> at 648 (holding that the "equitable remedy of partial rescission is an appropriate remedy to be considered if either a breach of the implied covenant of further development or undue hardship can be established and the trial court is convinced that monetary damages alone are an insufficient remedy") (emphasis added), but did not recognize, expressly or otherwise, distinct implied covenant to further explore.

14

**BOUNTY MINERALS V. EQT PRODUCTION                              1:17CV219**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTIONS TO DISMISS [DKT. NO. 25]**

This Court declines to conclude that, despite the Supreme Court's silence on the issue, West Virginia would be likely to recognize an implied covenant of further exploration. At bottom, there is no need to maintain a separate cause of action based on an implied covenant to further explore where, as here, an implied covenant to develop exists. In fact, it is for that very reason that other courts considering the question have declined to recognize a separate covenant of further exploration. See, e.g., Alford v. Collins-McGregor Operating Co., 2018 WL 321611, at *3 (Ohio Jan. 3, 2018) (declining to recognize a covenant of further exploration and noting that "[a]lthough the Landowners have an interest in the development of the land, that interest is sufficiently protected by the implied covenant of reasonable development and does not require recognition of a new implied covenant to explore further").

Moreover, as EQT has argued, the covenant to further explore is not without controversy because, under the covenant, "there is no need for the lessor to prove that further exploration would be profitable" and is therefore speculative in nature. See, e.g., Mitchell v. Amerada Hess Corp., 638 P.2d 441, 449 (Okla. 1981) (noting the "speculative burden the offered covenant would place on lessees" and declining to recognize it).

15

**D.   Implied Covenant of Development**

In its final claim for relief, Bounty alleges that, even without considering unconventional formations, EQT has breached the implied covenant of development by "severely fail[ing] to develop the leasehold[s]" (Dkt. No. 15 at 8). EQT contends that the implied covenant of development is not applicable to flat-rate leases (Dkt. No. 26 at 14-17).

In St. Luke's United Methodist Church v. CNG Development Co., the Supreme Court of Appeals reaffirmed the longstanding existence of an implied covenant to develop. 663 S.E.2d 639 (W. Va. 2008). There, "the three oil and gas wells that were drilled on the leased property [were] marginally productive." Id. at 641. Despite their concession that there had been continuous production that held the lease throughout its secondary term, the lessors argued that the lessee had breached the implied covenant of development by not drilling additional wells. Id. at 643.

The Supreme Court of Appeals found that the basis for implied covenant was well reasoned:

> [T]his covenant requires that "when the existence of either of these valuable mineral substances [oil and gas] in paying quantities becomes apparent from operations on the premises leased or on adjoining lands, the lessee shall drill such number of wells as in the exercise of sound judgment he may deem reasonably necessary to secure

16

> either oil or gas or both, for the mutual advantage of
> the owner of the land and of himself as operator under
> the lease; also for the protection of the lands leased
> from drainage through wells on adjoining or contiguous
> lands."

Id. at 644 (quoting Jennings v. S. Carbon Co., 80 S.E. 368, 369 (W. Va. 1913). A lessor may particularly enforce the covenant when he can prove that "operators for oil and gas of ordinary prudence and experience in the same neighborhood under similar conditions have been proceeding successfully with the further development of their lands or leases, and the further fact that additional wells would likely inure to the mutual profit of both lessors and lessee." Id. at 643 (quoting Adkins v. Huntington Development & Gas Co., 168 S.E. 366, 369 (W. Va. 1933)).

Thus, at bottom, the implied covenant of development obligates the lessee to do what is reasonable to obtain a profit for itself and the lessor. See id. at 645 (quoting Brewster v. Lanyon Zinc. Co., 140 F. 801, 814 (8th Cir. 1905)). Underlying the covenant is the desire to prevent lessees from holding a lease for purely speculative purposes, while another party stands ready to develop the leasehold. Id. at 645-46 (citing Parish Fork Oil Co. v. Bridgewater Gas Co., 42 S.E. 655, 660 (W. Va. 1902); Steelsmith v. Gartlan, 29 S.E. 978 (W. Va. 1898)). In St. Luke's, given that the lessee already had a vested interest and the parties appeared to

17

agree that further development would be beneficial, the Supreme Court of Appeals remanded the case to give the lessee "an opportunity to further develop the property." Id. at 647.

Here, Bounty has squarely alleged that EQT has breached its implied covenant to develop the leaseholds. According to Bounty, "operators for oil and gas or ordinary prudence and experience in the same general vicinity, or neighborhood, under similar conditions have been proceeding successfully with the further development of their land or leases" (Dkt. No. 15 at 8). It further alleges that "additional wells on the Land would likely inure to the mutual profit of both Bounty and EQT." Id. Under the Supreme Court of Appeals' articulation, Bounty has plainly stated a claim that EQT breached the implied duty to develop.

Nonetheless, pointing to the Supreme Court of Appeals' unpublished memorandum decision in Smith v. Chestnut Ridge Storage, LLC, EQT contends that the implied covenant to develop does not apply to its flat-rate lease. In Smith, the parties not only agreed that secondary term would extend "as long [after the primary term] as the said land is operated by Lessee in the production of oil and gas," but also "agreed that Lessee may drill or not drill on said land as it may elect." No. 14-0136, 2014 WL 6607569, at *1 (W. Va. 2014) (emphasis added). The parties further agreed that, "in lieu

18

of all delay rental, shut-in royalty or royalty due," the lessee could tender "an annual rental" for "storage and storage protection rights." Id. at *2. Given the parties' agreement, the Supreme Court of Appeals concluded that the lessors had expressly waived the implied covenant of development, and also that they had impliedly waived it by agreeing "to payment in a form other than royalties." Id. at *4.

The Court is not persuaded by EQT's argument that Smith controls this case. First, the leases at issue in this case contain no express waiver of the implied covenant, such as that the lessee "may drill or not drill . . . as it may elect." Second, the flat-rate payments contemplated by the leases simply are not "payment in a form other than . . . royalties from production." Id. at *4. Unlike Smith, where the alternate payments were for use of the leasehold for gas storage, the flat-rate payments in this case are listed with other "royalty" payments and are directly tied to the production of gas; the payment is made on a per-well basis.

Moreover, applying the implied covenant to develop to a flat-rate lease is not inconsistent with the holding in Bruen that, "where a flat-rate lease is involved, quantity of production is irrelevant to the continuation of the lease." The lease at issue in St. Luke's included a flat-rate provision, and the Supreme Court of Appeals nonetheless applied the covenant. Brief of Appellant, St.

Luke's, No. 33527, 2008 WL 952951, at *2 (W. Va. 2008). This holding is consistent with usual application of the covenant, which requires further development to protect from drainage despite the fact that minimal amounts of production would otherwise hold a lease. See, e.g., Adkins, 168 S.E. at 369.

## IV. CONCLUSION

For the reasons discussed, the Court:

- **GRANTS** EQT's motions to dismiss Bounty's claims for declaratory judgment, ejectment, slander of title, and breach of the implied covenant of further exploration and **DISMISSES** Counts One, Two, Three, Four, and Five of the amended complaint;

- **DENIES** EQT's motions to dismiss Bounty's claim for breach of the implied covenant of development in Count Six of the amended complaint; and

- **DENIES as MOOT** Bounty's motion to strike (Dkt. No. 17).

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: June 7, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE